# AFFIDAVIT

I, Colin Woods, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

*Agent Background*

1. I am a Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice. I have authority to enforce the criminal laws of the United States and to make arrests. I have been an FBI Special Agent since 2006. I am currently assigned to the Providence, Rhode Island (RI), Resident Agency (RA) of the FBI, specifically the RI Safe Streets Task Force (SSTF). I have been assigned to the Providence RA since March of 2010. Prior to transferring to the Providence RA, I was assigned to the Norfolk, Virginia division of the FBI. Before entering duty as a Special Agent, I served as a Captain in the U.S. Army. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. During my tenure as a Special Agent, I have been responsible for more than 100 illicit drug, gang, firearms and violent crime related investigations, resulting in the criminal convictions of more than 125 individuals. I have been the affiant on more than 250 arrest, search, cellular telephone, and Global Positioning Satellite (GPS) tracking warrants and on numerous wiretap applications. I have conducted extensive physical and wire surveillance, participated in hundreds of search warrants, and more than 300 controlled narcotic and firearm purchases. I have reviewed and listened to

thousands of taped drug conversations, and analyzed dozens of drug ledgers maintained by traffickers. I have also interviewed numerous users and distributors of illicit drugs. Therefore, I am thoroughly familiar with the manner in which illegal drugs are imported and distributed, the method of payment for drugs, and the efforts of persons involved in drug trafficking activity to avoid detection by law enforcement, as well as methods used to finance drug transactions and launder drug proceeds. In the same way, I am thoroughly familiar with the vernacular of the drug trade, common codes and jargon.

3. Additionally, based on my training and experience and my participation in other controlled substance investigations, I know that it is common for drug dealers to: "front" (provide on consignment) controlled substances to their customers; conceal contraband, the proceeds of drug sales, and store drugs and cash in remote locations sometimes referred to as "stash houses;" maintain records of drug transactions; and use cellular telephones to facilitate their drug distribution operations. I also know that drug trafficking is an illicit business and an ongoing process requiring the development, use and protection of a communication network to facilitate daily drug distribution. Drug dealers use various methods to thwart law enforcement detection, including frequently changing cellular phones and vehicles, using various aliases, and using coded communications. Based on my experience in drug investigations, I know that drug traffickers frequently refer to illicit drugs in guarded conversations and frequently use code words when referring to controlled substances or money.

4.     Based upon my training and experience and my participation in this investigation, I know that:

a.     Drug traffickers often place assets, including apartments, houses, vehicles, and telephones, in names other than their own to avoid detection of these assets by government agencies. Although these assets are held in other names, the drug dealers actually own or use these assets and exercise dominion and control over them. Records relating to these assets are frequently found in their residences and other locations controlled by them.

b.     Persons involved in drug trafficking conceal in their vehicles, residences, and businesses; controlled substances, large amounts of currency, financial instruments, precious metals, jewelry, and other items of value, and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring secreting, or spending money made from engaging in narcotic trafficking activities. Money, tangible property and records relating to these assets are frequently found in their residences and other locations controlled by them.

c.     Drug traffickers often carry, on their person or maintained in secure locations, weapons to protect themselves and their controlled substances from theft by other users, traffickers, or criminals, and from seizure by law enforcement agencies. Drug traffickers store these weapons in their residences, vehicles, and/or businesses and stash houses, or other locations controlled by them.

d.      Drug traffickers commonly maintain addresses or telephone numbers in books, papers, computers, cellular telephones and other electronic data storage devices, and other information that reveals the names, addresses, and/or telephone numbers for their associates in the drug trafficking organization, even if that information may be in code.  Records and electronic devices of this sort are also frequently found on the persons of drug traffickers or in their residences, motor vehicles, and other locations controlled by them.

e.      Drug traffickers frequently take, or cause to be taken, photographs and/or videos of themselves, their associates, or their property.  Records in the form of photographs and/or videos are often found in the residences, offices, or other places under the control of drug traffickers, and provide valuable evidence of conspiratorial relationships.  Records of this type are sometimes in hard copy are but increasingly found stored on computers, cellular telephones, thumb drives, and other items possessing the capability of storing electronic data.

f.      Drug traffickers often keep equipment and materials for packaging, cutting, weighing, manufacturing, and distributing controlled substances in their homes, stash houses or other locations controlled by them.  That drug paraphernalia often includes, but is not limited to, scales, plastic wrap, plastic bags, surgical gloves, presses, and cutting agents as well as aromatic substances such as soap, dryer sheets, wood shavings, and heat sealers all of which are used to mask the odor of illegal drugs in an attempt to avoid detection by drug

detection dogs. Large-scale drug traffickers sometimes use money-counting machines to help count and sort the proceeds of drug trafficking.

g. Drug traffickers commonly consign controlled substances to their clients and couriers. They frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. Records of this type are kept in locations where traffickers have ready access to them, including on their person or in their residences, stash houses, vehicles, businesses, smart telephones, tablets, personal computers and other electronic data storage devices. Drug traffickers also maintain these items and records for long periods of time regardless of whether their value to the drug dealer has diminished. Oftentimes, this type of evidence is generated, maintained, and then forgotten about. Thus, documents that one would think a prudent person would destroy because of their incriminatory nature are still possessed months or even years after the documents came into the possession of the drug dealer. Oftentimes, these individuals do not even realize the incriminatory nature of the documents they keep. Documentary evidence dating back years is sometimes found in residences and other locations controlled by traffickers.

h. Persons who reside in or who are using a particular residence will often have documents, bills, and correspondence which list their names and addresses in that residence. Documents such as personal telephone books, address books, utility company receipts, keys, personal letters, rent receipts, mortgage

5

documents, clothing and other articles of personal property would tend to establish residency at a particular location and provide valuable evidence concerning ownership and control over areas in which drugs or other incriminating evidence are found. Records and documents of this type may also be found in hard copy or stored electronically on computers, mobile telephones, and other media that store data electronically.

5. The facts in this affidavit come from my personal observations, my training and experience, and information reliably obtained from other agents and a Confidential Human Source (CHS) of proven reliability.

*Purpose*

6. I submit this affidavit in support of an arrest warrant for **Franklin Carlos Soto** (**SOTO**) who was born in the year 1987 and whose last known address was in Providence, RI, along with a Criminal Complaint charging him with distribution of fentanyl. In violation of 21 U.S.C. §§ 841 (a)(1), (b)(1)(B)(vi).

7. This affidavit is also submitted in support of Applications for Search Warrants for the following properties, their common areas and appurtenances for the evidence discussed in this affidavit and listed in Attachments B and C:

    a. **SOTO's** residence located at 22/24 Croyland Road, 2nd floor, It is as more fully described in this affidavit and in Attachment B; and

    b. The third floor apartment of **SOTO's** girlfriend, Yudelkis Lorenzo, located at 211 Sumter Street, Providence, RI, which **SOTO** uses as a stash house. 211 Sumter Street is more fully described in this affidavit and in Attachment C.

II.     **PROBABLE CAUSE**

*Introduction*

8. For approximately six months, United States government, including the FBI SSTF, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and the Rhode Island State Police (RISP), have been investigating **SOTO** for drug trafficking. Over the course of this investigation, as outlined in this affidavit, the target offender sold fentanyl.

9. In the course of this investigation, I have used a proven and reliable FBI-SSTF Confidential Human Source (CHS). [1] The CHS has been convicted of felony offenses. However, since completing his sentence, he has cooperated in a number investigations resulting in the seizure of controlled substances, drug proceeds and other evidence of drug trafficking, as well as the arrests and convictions of drug dealers. I am not aware of any instance in which the CHS provided false or misleading information in an investigation since he began cooperating with law enforcement.

10. In June of 2020, the CHS reported that to me that he was able to purchase controlled substances from a subject known to him as **"TONY."** The CHS told me that he had developed a relationship with **TONY**, and described him as a Dominican male, mid-30s, average height, medium build, and with a medium skin tone. The CHS informed me that **TONY** was in possession of kilogram quantities of fentanyl, smaller quantities of cocaine and multiple firearms. The CHS reported that **TONY** distributed

---

[1] The CHS has not requested anonymity and is available to testify, nevertheless I will refer to the CHS only as the CHS and use masculine pronouns regardless of the actual gender of the CHS to protect his identity from unnecessary disclosure.

7

hundreds of grams of fentanyl at a time and on a regular basis and that **TONY** used cellular telephone number 646-207-4675.[2] The CHS also reported that in May of 2020, he had been in **TONY'S** apartment located on Croyland Road, Providence, where the CHS observed seeing hundreds of grams of fentanyl, and two Glock pistols.

11.   The CHS was able to positively identify **TONY** as **FRANKLIN CARLOS SOTO** from a photograph soon after the first controlled purchase.

12.   Over the course of this investigation, the CHS participated in undercover operations known as "controlled buys." The CHS arranged the drug deals by cellular telephone. On each occasion, the CHS made contact with **SOTO** by cellphone in my presence or that of another law enforcement officer. The conversations or texts were overheard or seen and recorded. When a controlled buy was made, law enforcement investigators checked the CHS for contraband prior to the transaction to be sure that the CHS was not already in possession of any fentanyl, pills containing fentanyl, cocaine, crack cocaine, firearms, or additional cash. The CHS never was. The CHS was supplied with only enough money for the purchase of the amount of drugs or the firearm that had been ordered. In addition, the CHS was equipped with an audio and video recorder for all controlled buys and payments in which he participated. The CHS was followed to the transaction site by surveillance officers and surveillance was maintained near the drug deal. Following the transaction, the CHS was followed to a predetermined location where he turned over the evidence to me or another law

---

[2] Telephone number (646) 207-4675 was determined to be a prepaid cellular telephone with service provided by T-Mobile. No subscriber information is available.

enforcement officer working on this investigation. In each case, the CHS was debriefed. Where applicable, the audio and video recording devices were retrieved and reviewed. Additionally, a field test was performed on the drugs that had been purchased. In each case the field tests returned a positive indication for the presumptive presence of the fentanyl. The controlled substances acquired by the CHS were also weighed. The "gross weight" of the drugs reported in this affidavit refers to the weight of the controlled substance and the materials in which they were packaged at the time of purchase. All the controlled substances were sent for laboratory testing. If available, I provide the results with a net weight of the drug actually acquired. Whenever I use the term "controlled buy" in this affidavit, this was the procedure that we followed.

13. The CHS made controlled drug buys from **SOTO** on three occasions.

*The Target Offender*

14. **SOTO'S** criminal history lists the following contacts with law enforcement:

    a. September 20, 2013 immigration arrest in Laredo, Texas by ICE.

    b. March 1, 2015 drug arrest by the Lynn, Massachusetts Police department with no disposition.

    c. March 12, 2016 drug arrest by the Boston Police Department with no disposition.

    d. October 6, 2016 deportation to the Dominican Republic by ICE.

*Properties to be Searched*

22/24 Croyland Road, 2nd floor apartment, Providence, RI

9

15. **SOTO**, resides alone at this address, in the second floor apartment. It was the site of one delivery of fentanyl by **SOTO** on June 9, 2020. It was a location where the CHS observed what the CHS described as hundreds of grams of fentanyl, two Glock pistols and fortified "New York" bars on them.

211 Sumter Street, 3rd floor, Providence, RI

The residence of Yudelkis Lorenzo, the girlfriend of **SOTO** who resides on the 3rd floor, apartment 3, Providence, RI. It is a multifamily home located at 211-213 Sumter St.. Lorenzo lists 211, apartment 3 as her address with the Rhode Island Division of Motor Vehicles. 211 Sumter St., Providence, RI serves as a drug stash house for **SOTO**. **SOTO** was observed returning to 211 Sumter St. following the delivery of narcotics on June 18, 2020 and observed departing from 211 Sumter St. just prior to the delivery of narcotics on June 25, 2020.

*Investigative Chronology*

Controlled Buy on June 9, 2020

16. On June 9, 2020, the SSTF made a controlled buy of 50 grams of a fentanyl from **SOTO** for $2,500. The CHS contacted **SOTO** at telephone number (646) 207-4675 to place the order. Subsequently, the CHS engaged in conversations with **SOTO** via text message conversation. **SOTO** agreed to sell the CHS 50 grams of a fentanyl for $2500. Later the same day, the CHS met with law enforcement and placed a consensually recorded telephone call to (646) 207-4675, the person the CHS knew as **TONY**. **SOTO** instructed the CHS to meet him at the CVS parking lot on Thurbers Avenue in Providence and that he would bring the CHS back to his apartment. The

CHS was surveilled by law enforcement to the CVS located at 960 Broad Street, Providence, RI, at the corner of Broad St. and Thurbers Avenue. The CHS contacted law enforcement and informed agents that **TONY** was in a gray Jeep Liberty and that the CHS was following **TONY** to his apartment. Law enforcement agents who were conducting surveillance, followed the CHS to the vicinity of 22/24 Croyland Road, Providence, RI. Agents observed a silver Jeep Liberty (MA 9NJ462) parked in the driveway at that location. A Massachusetts registration check confirmed that MA 9NJ462 is the plate assigned to a 2004 Gray Jeep Liberty which is registered to Edward Santos Garcia, YOB 1994, from Quincy MA, with a mailing address on Gallup Street in Providence, RI. The CHS's vehicle was also observed parked in the driveway. The CHS was observed leaving 22/24 Croyland Road, where the CHS entered the CHS's vehicle and drove to the predetermined meeting location where the recording device and suspected narcotics were given to law enforcement by the CHS. The CHS informed your affiant that the CHS followed **TONY** to the residence located at 22/24 Croyland Rd. The CHS reported that the CHS entered the door on the right front side of the house marked #24 and walked up to the second floor, where the CHS met with **TONY**. The CHS reported another male was present. The CHS described this other male as skinny, Puerto Rican, and wearing a red shirt. CHS turned over one clear bag of a suspected fentanyl. The CHS stated that the CHS made observations of **TONY** being in possession of a large plastic bag with a powdery substance approximated to contain 500-700 grams of suspected fentanyl. The CHS reported that **TONY** took out 50 grams, weighed it and provided it to the CHS. The CHS also observed **TONY** to

11

have a large amount of cash on him and in his wallet.  **TONY**, informed the CHS that his birthday was "today" and that he was 33 years old.

17.     The substance field-tested positive for fentanyl and had a gross weight of approximately 53.2g.  The presumptive fentanyl was sent to the Rhode Island Department of Health Division of Laboratories, Forensic Drug Chemistry section in Providence for confirmatory testing.

18.     Law enforcement obtained the Massachusetts driver's license photograph for Edward Santos Garcia and determined that **TONY** was not the individual depicted in the license photo.

19.     Law enforcement officers obtained a picture of **FRANKLIN CARLOS SOTO** from official United States immigration documents and showed the photograph to the CHS.  The CHS positively identified the photograph of **SOTO** as the individual the CHS knew as **TONY** and had purchased fentanyl from on June 9, 2020.  Law enforcement records indicate that **SOTO** has a date of birth of June 9, 1987, and celebrated his 33rd birthday on June 9, 2020.

20.     Your affiant also reviewed the surveillance photos and still photographs captured from the June 9, 2020 controlled buy and the photograph from immigration documents and I believe the individual whose image was captured form the surveillance device is **SOTO**.

Controlled Buy on June 18, 2020

21.     On June 18, 2020 the SSTF made a second controlled buy of 50 grams of a fentanyl.  The CHS was directed by a member of the SSTF to contact **SOTO** to arrange

12

the purchase.  The CHS contacted **SOTO** at (646) 207-4675.  **SOTO** subsequently called the CHS and told him that the deal would not take place at Croyland.  **SOTO** informed the CHS that he had been pulled over by police in Massachusetts and was nervous about being detected by law enforcement.  **SOTO** informed the CHS that the transaction would be taking place later that day.  **SOTO** further informed the CHS that he had removed some of his narcotics to his girlfriend's house and was going to be working out of the girlfriend's house.  Later that day, the CHS met with agents of the FBI SSTF to complete the purchase.  While in the presence of members of the FBI SSTF, the CHS received a telephone call from (646) 207-4675.  During the call, **SOTO** told the CHS to meet him at the CVS located at 960 Broad Street, Providence.  The CHS was given $2500 for the purchase.  Surveillance was set up in the area of 24 Croyland Road and the CVS.  Members of law enforcement observed **SOTO** arrive at 24 Croyland Road in a gray Honda Civic bearing MA registration 224M10 and **SOTO** entered the residence though the front door of the house designated 24.  MA 22410 is also registered to Edward S. Garcia of the same Quincy address and Providence, RI mailing address as referenced in paragraph 16 above.  Approximately 15 minutes later, **SOTO** was seen leaving 24 Croyland and appeared to be engaged in a telephone conversation.  At the same time, the CHS had received a telephone call from **SOTO** telling the CHS that he was approximately 10 minutes away and to meet him at the CVS.  Law Enforcement officers observed **SOTO** leave 24 Croyland on a green motorcycle.  The CHS drove to the CVS located at the corner of Broad Street and Thurbers Avenue.   A short time later, **SOTO** arrived at CVS in a gray Honda Accord bearing RI registration

HC-698. Both the CHS and **SOTO** left the parking lot in their respective vehicles and were followed to Central Liquors located at 930 Broad Street, Providence, RI. **SOTO** talked to the CHS outside and then returned to the Honda. The CHS and **SOTO** then entered the liquor store where they remained for a few minutes. After the CHS and **SOTO** left Central Liquors, the CHS entered the driver side of the CHS's vehicle and **SOTO** entered the passenger side of the CHS's vehicle. Soon after, **SOTO** returned to the Honda Accord and drove off.

22. **SOTO** was surveilled to La Sunrisa restaurant where he remained for less than 10 minutes and was then observed driving to 211 Sumter Street where he entered the front door of the residence, the door located on the right hand side of the home under the number marked 211.

23. The CHS drove to the predetermined meeting location where he met with members of law enforcement and turned over the recording devices and suspected narcotics. The CHS reported that after waiting at CVS for **SOTO** to arrive, the CHS was instructed by **SOTO** to follow him to the liquor store. Once there, **SOTO** informed the CHS that he had to get something for his girl at the liquor store. Once at the liquor store, **SOTO** told the CHS to enter the liquor store with him. Once outside, **SOTO** and the CHS got into the CHS's vehicle where the CHS gave **SOTO** $2500 in exchange for the 50 grams of the suspected narcotics. The CHS reported that while sitting in the CHS's car, **SOTO** told the CHS to be careful with the "money in his hand" and "this isn't a game man, this is fentanyl man." **SOTO** also was concerned that he was being followed, he stated "see what I'm telling you. Those guys were right

there. Once they saw me get out of the car they moved. You see the one with the van. See that's what I'm trying to tell you. You have to be careful."

24. At the same time that the CHS and **SOTO** were having the discussion about the van, members of the SSTF were conducting surveillance from the van located at the liquor store and referenced by **SOTO**.

25. The substance delivered field-tested positive for fentanyl with a gross weight of approximately 54.5. The presumptive fentanyl was sent to the Rhode Island Department of Health Division of Laboratories, Forensic Drug Chemistry section in Providence for confirmatory testing.

Controlled Buy on June 25, 2020

26. On June 25, 2020, the SSTF made a controlled buy of 25 grams of fentanyl from **SOTO** for $1,250. The CHS contacted **SOTO** at telephone number (646) 207-4675 to place the order. **SOTO** agreed to sell the CHS 25 grams of fentanyl for $1,250. Later, the CHS met up with law enforcement and the CHS received a phone call, which was recorded and listened to by law enforcement agents. During the conversation, **SOTO** told the CHS that he would be ready at 5:45 and that he was with family now. **SOTO** asked the CHS if he wanted 100 grams, and also offered to sell crack cocaine. The CHS told **SOTO** he only wanted the 25 grams.

27. At approximately 5:45 p.m. **SOTO** contacted the CHS and told him to meet him at Club Mi Sueno on Broad Street in Providence in 15 minutes. He told the CHS that he was just returning from the lake.

28. Law enforcement established surveillance in the vicinity of Mi Sueno as well as 211 Sumter St. and 24 Croyland Rd. in Providence. The CHS was surveilled to Mi Sueno where he left his car and walked toward Mi Sueno.

29. At approximately 5:53 p.m. **SOTO** arrived at 211 Sumter St., driving the gray Honda Civic, Massachusetts registration 224M10. SOTO entered the residence. About five minutes later, **SOTO** exited 211 Sumter St., returned to the Civic and drove off. Moments later, **SOTO** arrived at Mi Sueno and met with the CHS on the side of the building. The CHS and **SOTO** then entered the Civic and **SOTO** drove it to the back of the parking lot. Soon after, the CHS left the parking lot and walked to his vehicle. **SOTO** then left the area and surveillance of him was terminated at Niagara Street in Providence. The CHS also left the area and was surveilled to the predetermined meeting location where he turned over the recording device and suspected narcotics to law enforcement. I believe SOTO briefly stopped at 211 Sumter St. to pick up the narcotics that he provided to the CHS at Mi Sueno.

30. The CHS told law enforcement that when he arrived at Mi Sueno he asked a waitress whether TONY was there and was informed that he wasn't there yet. The CHS said that **SOTO** arrived and appeared to be drunk or high. The CHS stated that **SOTO** purchased 2 beers and that they went to **SOTO's** car to complete the transaction. The CHS stated that he handed the $1,250 to **SOTO** and **SOTO** handed him the drugs. **SOTO** told the CHS that he gave him an extra 6 grams.

31. The substance was field-tested and tested positive for the presence of fentanyl and had a gross weight of approximately 29.6 grams. The presumptive

16

fentanyl was sent to the Rhode Island Department of Health Division of Laboratories, Forensic Drug Chemistry section in Providence for confirmatory testing.

**SOTO** and Immigration

32.     It was determined through United States Immigration and Customs Enforcement (ICE) that **SOTO** is not a citizen of the United States, nor at any time was he a lawful permanent resident.  **SOTO** has been identified to have been born in the Dominican Republic.  He was found be in the United States on September 20, 2013 by United States Border Patrol in Laredo, Texas and he was released on bond.  On August 22, 2016, an Immigration Judge in Boston, MA ordered **SOTO** removed and he was removed by ICE Air out of New Orleans, Louisiana.   It was determined by law enforcement that **SOTO** had not received the consent of the Attorney General of the United States to apply for readmission to the United States since the time of his previous deportation.

**SOTO** and Yudelkis Lorenzo, 211 Sumter Street, apartment 3, Providence RI

33.     As stated by the CHS on June 18, 2020, **SOTO** informed the CHS that he would be moving his narcotics to his girlfriend's home.

34.     The New England High Intensity Drug Trafficking Areas Task Force (HIDTA) was conducting an investigation in March of 2020.  Law enforcement agents assigned to the Task Force conducted a trash pull of garbage left at the curb in front of 211-213 Sumter Street.

35.     In one garbage bag, HIDTA found multiple plastic baggies commonly associated with narcotics packaging.  Two of the baggies appeared to have a powder

residue on them and were field-tested. One tested positive for the presence of cocaine and one tested positive for the presence of fentanyl. Inside the same garbage bag law enforcement located a rental application for an apartment located at 18 Inkerman Street #2 Providence, RI, 02908. Applicant 1 was listed as Yudelkys Lorenzo with a current address of 211 Sumter Street 3fl. The current employment for applicant 1 was listed as The Cedar Crest. Applicant 2 was listed as Vandir De Aguiar with a current employer of Junior's Landscaping in Hyannis, Massachusetts. Also located in the trash was a document which appears to be the copy of an email sent by Alan Richards to Cedar Crest Cedar Home health. The subject of the email was Covid-19 testing for all Cedar Crest and Cedar Home Health employees. On the document are handwritten notes listing a testing time of Friday at 4:30 p.m. Also located was a Rhode Island hospital bracelet in the name of Luis E Sanchezsoto with a date of birth of June 9, 1987 for an admission on 2/14/2020.

36. On January 15, 2020 members of the Rhode Island State Police conducted a car stop of the 2011 gray Honda Accord registered to Yudelkis Lorenzo at 211 Sumter Street, 3, Providence, RI. The driver provided what was appeared to be a Dominican Republic driver's license listing the name Luis Ernesto Sanchez Soto and a date of birth of June 9, 1987. The identification was photographed by the Rhode Island State Police and the operator was issued a citation. The identification listed the same name and date of birth as the hospital bracelet that was discovered during the examination of the trash from 211 Sumter St., apartment 3, Providence, RI in March 2020.

37. Your affiant obtained a photo of the identification produced at the stop. The identification bears the photograph of the individual identified as **SOTO** though immigration documents and is the individual who was recorded delivering fentanyl to the CHS on June 9, 2020, June 18, 2020 and June 25, 2020.

38. In the middle of the month of June 2020, members of the SSTF also received information from a different CHS who knows Lorenzo to be the girlfriend of the individual identified as **SOTO**. This CHS is not available to testify. He has cooperated with law enforcement in the past and provided reliable information to law enforcement which has led to the arrest and conviction of individuals for narcotics offenses. Law enforcement is not aware that this CHS has provided false or misleading information in an investigation since he began cooperating with law enforcement. This CHS informed SSTF members that **SOTO** splits his time between his girlfriend's apartment on Sumter St. and the Croyland Rd. addresses. This CHS also reported that he had seen the individual identified as **SOTO** with Glock pistols in the past. This information regarding the Glock pistols has been corroborated by the CHS who is available to testify and who has been found to be reliable and not to have been untruthful.

### III. CONCLUSION

39. I therefore suggest that there is probable cause to arrest the target offender, **SOTO**, for distributions of fentanyl and illegal reentry. I further suggest that there is probable cause to search the residences described in Attachments B and C for the evidence described in Attachment A.

Respectfully submitted,

COLIN WOODS
Special Agent
FBI

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by _____Sworn telephonically and signed electroncially_____.
*(specify reliable electronic means)*

_____July 1, 2020_____          _____[signature]_____
*Date*                                            *Judge's signature*

_Barrington, RI_____          _Patricia A. Sullivan, USMJ_____
*City and State*                              *Printed name and title*